## The Inhb'ts of LEEDS vs.  The Inhb'ts of FREEPORT.

Where a minor whose parents were dead, became chargeable to the town in which he had his legal settlement; and by his consent, the overseers of the poor bound him out as an apprentice to learn a trade in another town, where he was residing as such apprentice on the 21st day of *March*, 1821, it was *held*, that his settlement became fixed in the latter town pursuant to the provisions of *Maine Stat. ch.* 122, *sec.* 1.

Whether the business of *farming* comes under the appellation of " *a trade*," within the true intent and meaning of *stat.* of 1820, *ch.* 122, *sec.* 6. — *dubitatur.*

IN this action, which was *assumpsit* to recover for supplies furnished a pauper, the following facts were agreed by the parties.

*Moses Welch* and family, the paupers described in the plaintiffs' writ, fell into distress in the town of *Leeds*, in *Dec.* 1831, and were supplied with necessaries to the amount of $37,87. The regular notice and answer was given and returned, and the only question in the case was, whether the legal settlement of *Moses Welch* was in the defendant town, or otherwise.

It was agreed that, said *Welch* was born in the town of *Freeport*, *June* 16, 1805, the legal settlement of his parents being in that town at the time — that in the year 1808, the father of said *Moses* died, when the family was broken up ; the death of the mother following in a year or two afterward, neither leaving any property. — That, in *April*, 1811, the said *Moses* was on expense of one shilling per week to the town of *Freeport*, — and that, on the 6th of *May*, 1811, by consent of said *Moses*, he was bound out by the overseers of the poor of said town,

to one *Daniel Fogg* of *New-Gloucester*, a *farmer*; the indentures being in the usual form. That he lived with, and had his only place of residence at the house and in the family of the said *Fogg*, from said 6th day of *May*, 1811, to the 4th day of *November*, 1823, when the indentures were cancelled at the request of said *Moses*, and by the consent of said *Fogg*, and the overseers of the poor of the town of *Freeport*.— After which, and during a part of the winter and summer following, he worked with said *Fogg*, on wages.— He then left *New-Gloucester*, and did not return to tarry or labour, until 1828, when he returned with a family, and remained there until 1830. — It was agreed that he had never lived in *Freeport* since *May* 6, 1811.

If on these facts it should be the opinion of the Court, that the plaintiffs were entitled to recover, the defendants were to be defaulted and judgment entered for the $37,87, and costs — otherwise, the plaintiffs were to become nonsuit, and the defendants allowed their costs.

*Sprague* and *A. Belcher*, for the plaintiffs.

The settlement, which it is admitted the pauper once had in *Freeport*, has never been lost and a new one acquired in any other town.

His residence in *New-Gloucester* on the 21st of *March*, 1821, did not establish his settlement in that town according to the true intent of *stat.* of 1821, *ch.* 122, *sec.* 1. It was not intended to embrace a case of residence by any minor under articles of apprenticeship. *Charlton v. Stockbridge*, 15 *Mass.* 248; *New-Chester v. Bristol*, 3 *N. H. Rep.* 71. Certainly, not of a minor who, as a pauper, had been bound out by the overseers of the poor. During the whole period of the apprenticeship he may be considered as having *received supplies* from the town of *Freeport*, and the case, therefore, would fall within the *exception* of the *stat.* before cited, fixing the settlement of all persons in the towns wherein they resided upon a certain day. 7 *Greenl.* 499, *Appendix.* He had not the legal power to gain a settlement by residence, while a minor, not having been emancipated. The instant he ceased to be under the control of his

parents, he became subject to the control of the overseers of the poor of *Freeport*. After the binding out, the master had a control over him by virtue of the indentures, and the overseers of the poor of *Freeport* also retained a supervisory power, they being bound by statute to see that the covenants in the indentures were performed. There was, therefore, in this case, no emancipation. *Taunton v. Plymouth*, 15 *Mass.* 203.

*R. Belcher*, for the defendants, maintained that the pauper was *emancipated* by the death of both his parents. — That, he thereby became capable of acquiring a settlement in his own right — and did acquire one in *New-Gloucester* by virtue of his residence there on the 21st of *March*, 1821. In support of the several positions taken, he cited *Lubec v. Eastport*, 3 *Greenl.* 220 ; *Sidney v. Winthrop*, 5 *Greenl.* 124 ; *Fairfield v. Canaan*, 7 *Greenl.* 90 ; *Knox v. Waldoborough*, 3 *Greenl.* 454 ; *Bowes v. Tibbets*, 7 *Greenl.* 457 ; *Sumner v. Sebec*, 3 *Greenl.* 223.

He further contended that, the pauper gained a settlement in *New-Gloucester* by setting up his trade there within a year after the termination of his apprenticeship.

He also denied the power of the overseers of the poor to bind out a pauper child to learn the art of *farming*, contending that it was not a " trade," within the meaning of the statute.

PARRIS J. delivered the opinion of the Court.

As the pauper gained a derivative settlement in *Freeport* from his father, that settlement continues under the first section of the general pauper law of this State, *ch.* 122, providing that all settlements already gained by force of the laws of *Massachusetts* previous to the separation, or otherwise, shall remain until lost by gaining others in some of the ways pointed out in the general law aforesaid.

It is incumbent on the town of *Freeport*, in sustaining their defence, to show that he has thus lost his settlement, in that town, which he derived from his father.

It is contended in defence, that the pauper gained a settlement in *New-Gloucester*, by serving an apprenticeship and setting up his trade therein. The statute provides that " any mi-

" nor who shall serve an apprenticeship to any lawful trade, for
" the space of four years in any town, and actually set up the
" same therein within one year after the expiration of said term,
" being then twenty-one years old, shall thereby gain a settle-
" ment in such town."

The case finds that the pauper was bound as an apprentice,
in *New-Gloucester*, to learn the trade of a farmer. We much
doubt whether the business of farming comes under the appel-
lation of a trade, within the true meaning of the statute.

But if farming could be considered as a trade, so that an ap-
prentice to a farmer, to learn the business of farming, and set-
ting up the trade and continuing it, as the statute provides, for
one year, could gain a settlement, still the defence in this case
is not sustained.

The pauper was to serve his master under the indentures un-
til the 9th of *October*, 1825, when he arrived at twenty-one
years of age. He left, by consent of his master, in *November*,
1823, and although he was occasionally in *New-Gloucester*, in
the year 1824, yet it is expressly stated that he did not work
there, after the summer of that year, until the autumn of 1828,
when he returned with a family. The statute requires that he
shall set up the trade within one year after the expiration of
the term, being then twenty-one years old. This the pauper
did not do. If the term is to be considered as ending when
he left his master in *November*, 1823, no setting up of a trade
could avail then, for he was still a minor but about nineteen
years of age. If it be contended that the term did not expire
until he became of age, then he did not set up his trade in the
town within one year, for he became of age in *October*, 1825,
but was not employed in any business in *New-Gloucester*, from
the summer of 1824, until the autumn of 1828.

This branch of the defence, therefore, would wholly fail,
even if *Welch* had been an apprentice to a trade within the
meaning of the statute.

It is further contended, that the pauper lost his settlement in
*Freeport*, by being in *New-Gloucester*, and residing and having
his home there on the 21st of *March*, 1821, the time of the
passage of our general pauper law. The following is the clause

of the statute relied upon. " Any person resident in any town
" at the date of the passage of this Act, who has not within
" one year previous to that date received support or supplies
" from some town as a pauper, shall be deemed to have a set-
" tlement in the town where he then dwells and has his home."

That this branch of the statute was intended to embrace
minors, under certain circumstances, as well as persons of full
age, is manifest from the phraseology of the paragraph imme-
diately preceding it, which provides that a residence of five
years shall give a settlement, provided the person thus residing
be of the age of twenty-one years. The change of language
indicates the intention that the one case shall be limited to per-
sons of full age, the other not, — and such is the construction
which this Court has given it in *Lubec v. Eastport*, 3 *Greenl.*
220. This Court has decided also, that it does not, in all cases
require the exercise of volition to gain a settlement under this
provision of the statute.

In the case just cited, the Court say, " The act of 1821
" operated on thousands, to fix their settlement in towns in
" which they respectively dwelt and had their home on the day
" of its passage, without any volition on their part, and even
" without their knowledge. The want of understanding and
" power of volition in the pauper would not seem to furnish
" any objection to his capacity to gain a settlement in a town,
" by his dwelling and having his home there when the act was
" passed." — In *Sumner v. Sebec, ibid.* 222, the point upon
which the decision turned was, whether the pauper was eman-
cipated at the passage of the act. She resided in *Sumner*, her
parents in *Sebec*. It was contended that she, although a minor,
gained a settlement in *Sumner*, because her parents had eman-
cipated her. The Court, however, held that the facts proved
did not amount to emancipation, and that her settlement fol-
lowed her father's. — It is evident from the case, that if eman-
cipation had been proved, the decision would have been that
she gained a settlement in her own right, in consequence of
dwelling and having her home in *Sumner*.

In the case before us there was a clear emancipation. Both
parents had been dead for more than ten years, and the pauper

had resided in *New-Gloucester* for nearly the whole period; had not resided, neither does it appear that he had even been within the limits of *Freeport* for upwards of nine years.

In the language of the statute, he *resided* in *New-Gloucester*, he *dwelt* there, and *Fogg*, his master, with whom he lived, says his home was there at his, *Fogg's* house, from *May*, 1811, to *November*, 1823. If his home was there, the statute fixes his settlement there, and he consequently thereby lost the settlement which he derived from his father in *Freeport*.

In *Sidney v. Winthrop*, 5 *Greenl.* 123, the Court decided that the pauper had her home in *Sidney*, although she was *non compos* and was supported there by her grandfather whose home was in *Winthrop*.

In *Holyoke v. Haskins*, 5 *Pick.* 20, the Court decided that a person *non compos*, whose derivative settlement was in *Boston*, and who owned real estate there, changed her domicil by being removed to *Natick*, although she was there supported by her guardian, an inhabitant of *Boston*; — that the domicil of a person *non compos mentis*, under guardianship, may be changed by the direction or with the consent of the guardian. The doctrine, that a guardian may change the domicil of his ward, is also recognized by *Story* in his late Treatise on the Conflict of Laws.

These cases shew that it does not require volition as indispensably necessary to establish a domicil or home, and that it may be done for those who have not the power of volition, by their friends or guardians.

It has been urged that *Welch* is to be considered in the light of a pauper during his residence in *New-Gloucester*, and the case of *Southbridge v. Charlton*, 15 *Mass.* 248, has been adduced as an authority, that where a pauper is supported in another town, different from that in which he has a settlement, it will not change his settlement.

It would be most unreasonable if it did. That case arose upon a division of the town of *Charlton*, and the pauper had a derivative settlement in that town from an ancestor whose settlement was acquired by owning real estate in the old town.

The Court decided that, although the pauper had been sup-

ported by *Charlton* within the territory that constituted the new town, yet inasmuch as he derived his settlement from those who belonged to the old town, he should be chargeable there also.

If *Welch* was chargeable to *Freeport* when the overseers bound him to *Fogg*, by that act the town was relieved, so far as *Fogg* was able to relieve it, from all accountability concerning the apprentice, and the overseers were divested of all authority over him. *Fogg* was entitled to his labour and his earnings, was answerable for his support, his instruction and his acts, so far as a master is answerable for the acts of his servant.

*Welch*, before he left his master, was liable to taxation in *New-Gloucester*; to be enrolled in the militia there, was entitled to receive instruction in the public schools there, and without doubt was included in the number on which was based the representation of the town in the legislature.

We do not consider him in the light of a pauper, after the binding out, but rather like an apprentice or servant bound by a guardian; and that the overseers are, *ex officio*, by the sixth section of the act, constituted the guardian for the purpose of binding out. They are authorized to bind out the children, not only of those parents who have actually become chargeable, but children whose parents shall be thought by the overseers to be unable to maintain themselves, although not chargeable. It was under this provision that *Welch* was bound. His parents, being dead, were unable to support and maintain him, and the statute vested in the overseers the power of binding him out. A very different power from that which is given to them by the 8th section, granted for different purposes and to be exercised in a very different manner. That applies to persons of full age, idlers and such as are liable to be sent to the house of correction, and it was in relation to this class only, that the observations of the Justices of this Court applied in their answer to the Governor and Council of *June* 1831. The inquiry was made only concerning such, and the reply is applicable to no others.

At the time of the passage of the act, *Welch* was seventeen years of age, fully able then and for many years previous, to

earn his support. So far from receiving supplies in any way as a pauper, at that time, he was abundantly able to provide for himself; and we think it would be doing violence to the obvious and true meaning of the statute to consider him as having a home in *Freeport*, or as receiving supplies or support as a pauper from that or any other town on the 21*st* of *March*, 1821.

According to the agreement of the parties, the plaintiffs are to become nonsuit.